WILLIAM JERNEGAN v. EDMOND GRAY,
AND
R. C. MESSICK et al. v. COFFEE COUNTY et al.,
AND
EDMOND GRAY v. WILLIAM JERNEGAN.

1. REVENUE BONDS. *Execution of by sureties.* The act of 1879 (chapter 9), required county trustees to appear before the county court, on or before the first Monday in March and, with their sureties, acknowledge their willingness to be bound anew on their then existing bonds, or to give new bonds; and it declared the office of such trustees as failed to renew the old, or to give new bonds, vacant. To meet the requirements of this statute the trustee of Coffee county, and one Ashley, as the attorney in fact of the sureties, appeared before the county court. Mr. Ashley assumed to act under a power of attorney which authorized him (*sic*) "to *sign and acknowledge* our names to *any* bonds," etc. The old sureties of the trustee, and Mr. Jernegan, a new man, executed the power of attorney to Mr. Ashley. Mr. Ashley, as such attorney, acknowledged the *old* bond for the sureties, and added the name of Mr. Jernegan as additional surety thereto. *Held,* that the old sureties and the new surety, Jernegan, were all bound.

2. MOTION AGAINST TRUSTEE ON HIS BOND. *Parties. Amendment.* Where a motion which should have been made in the name of the State for the use of parties entitled, is made against a trustee and his *sureties* upon notice alone to the trustee, in the name of the chairman of the county court, it may be amended by the consent of the trustee, so as to be in the name of the State; and in the absence of fraud, collusion or mistake, the sureties will be bound as if the suit had been instituted in the name of the State in the first instance.

Jernegan v. Gray.

3. SCHOOL FUND. *Motion in name of State for use of county.* A motion may be maintained in the name of the State for the use of a county to recover of a delinquent trustee, school moneys collected by him.

### FROM COFFEE.

Appeal from the Chancery Court at Manchester. E. D. HANCOCK, Ch.

SMITH & BASHAW for Messick.

JONES & TOWNSEND, STONE & CLARK, MARKS &. AYDLETT, E. COOPER and JAMES E. JONES for Coffee county.

CROSS & ISBELL. for William Jernegan.

C. A. SHEAFE and SMITH & BASHAW for defendants.

WILSON, Sp. J., delivered the opinion of the court.

In August, 1876, Edmond Gray was elected trustee of Coffee county for two years. He was re-elected in 1878. Soon after each election he gave three several bonds, which were accepted and approved, and he was inducted into office.

The record discloses that he was without business capacity, and utterly unfit to perform the duties of the office. As the result of his incompetency he was found, upon settlement made with him in June, 1881, to be behind with the county, for county revenue proper, for 1879, $2,707.39, and to the school fund for the same year $3,484.84.

The chairman of the county court, on the 30th of August, 1881, served a notice upon him that he would, on the Wednesday after the first Monday in September following, move before the circuit court for judgments against him and his sureties for the sums above stated, interest, penalties and costs.

By agreement and consent, the motion was not entered on the day specified in the notice, but was postponed from day to day. The case was docketed, however, at this term of the circuit court, styled "C. N. Townsend, etc., against Edmond Gray and others; motion, two cases;" and the record from that court, under this caption, recites that "now by consent of plaintiff and defendants, it is agreed that these causes be continued until the next term, at which time it is agreed the motion may be entered and the trial of the motion be had, and that the defendant agrees to confess judgment at that term for whatever amount may then be due."

At the following term of the circuit court the cause appears under the caption or style of "The State of Tennessee to the use of Coffee county against Edmond Gray and sureties," naming them; and on the 7th of January, 1882, during this term, judgments were rendered against him and sureties named, one for $2,572.45, to cover his default to the county for county revenue proper for 1879, and the other for $4,034.98, his default to the school fund for the same year.

Both judgments entered in the circuit court recite that when the motion was called up at this term,

the plaintiff and defendants appeared by attorney, etc. The weight of the evidence is, that the sureties had no personal notice of the motion against Gray and them, and no knowledge of the judgments until after their rendition. But it is perfectly certain that Gray had notice, and that he was in court consenting to the postponement of an actual entry of the motion on the day specified in the notice served upon him by the chairman of the county court, and consenting also to all the steps leading up to the judgments in the name of the State for the use of the county; for, alluding to his own testimony, he made an agreement, at this term of the court, with the attorney representing the county, under which no executions were to issue on the judgments until after the succeeding term, and during this interval he was to receive credits for all payments made, and for all legal *vouchers* that he might produce, for which he had not been allowed credit before this rendition. In a few days after the judgments were taken, he did pay to the attorney of the county some $700 in money, and turned over to him some assets, amounting to several hundred dollars, as payments on them. An execution issued on these judgments soon after the adjournment of the court, and they were ordered to be held up and returned by the attorney of the county in conformity with the agreement made with Gray. After the succeeding term of the court, the judgments not having been paid, nor abated by the production of legal vouchers, *alias* executions were issued to one Carroll, then acting sheriff of the county, who, on

May 10, 1882, levied them upon the lands of William Jernegan, John Harrell, Jefferson East and R. C. Messick, Sr., sureties of Gray, and defendants with him in the judgments. These lands were sold by the sheriff July 19, 1882, and bid in by the county of Coffee, and by the amounts bid on them at the sale, and subsequent advancements on her bids, the county realized $2,207.40 on one judgment, and $3,576.40 on the other.

The original bill of Jernigen in this case was prepared and sworn to July 7, 1882. It was presented to a judge on July 17, 1882, and a fiat was granted directing the clerk and master, upon the execution of a bond in the penalty of $1,000, as the transcript says, to issue "writs of attachment," as prayed for. We presume a writ of injunction was intended, as this was what was sought in the bill, for the purpose of stopping the sale of his land. No bond, however, was given, and no process of the kind issued. A prosecution bond was not given until August 7, 1882, and this may be taken as the date of the commencement of his suit. He made Gray and all the sureties on the bonds of his first term defendants to his bill.

It is proper to state here that all the sureties on the bonds of Gray, originally executed by him for his second term, were on his bonds for his first term, except one James E. Rhodes, and all the sureties on his bonds for his first term were on his second term bonds, except L. Ewell, W. F. Lawrence, J. W. Lawrence and Simeon Ashley.

Jernegan became involved as surety in this wise: By an act of the Legislature, passed January 29, 1879, (Ch. IX., page 12, Acts of 1879), amendatory of an act passed March 23, 1875, the time was extended for trustees to turn over to constables certified statements of uncollected taxes; and under the second section of this amendatory act, trustees, before proceeding further to collect taxes, were required, with their sureties, to appear before the county courts of their respective counties on or before the first Monday in March, 1879, and acknowledge, in writing, their willingness to be bound anew under the terms and conditions of their bonds previously executed. It further provided that if any trustee and his sureties failed to appear and acknowledge their liabilities, said trustee was to give new bonds, and if the one or the other was not done, by the time specified, his office was declared to be vacant, and the county court of his county was directed at once to fill the vacancy as required by law.

To meet the requirements of this law, Gray, February 22, 1879, presented a power of attorney to five of the sureties on his bonds for his last term, and also to Jernegan, and it was signed by them. The power of attorney is as follows: "We, the undersigned, do hereby nominate and appoint Simeon Ashley our attorney in fact to sign and acknowledge our names to any bond that may be required of Edmond Gray, tax collector of Coffee county elect, by said county court, and we do hereby ratify and confirm all of the lawful actings and doings of said

Simeon Ashley in pursuance of the power and authority hereby communicated as fully as if we were to do them ourselves."

Simeon Ashley, who was then clerk of the county court, in open court, on the first Monday of March, 1877, by virtue of the power given him in this instrument, bound the sureties signing it, already on the bonds of Gray, to continue liable thereon, and added the name of Jernegan as an additional surety on them, and said court entered upon its minutes that "this day, in pursuance of the act of the General Assembly of Tennessee, Edmond Gray, trustee, etc., with sureties represented by Simeon Ashley, attorney in fact, appeared in open court, and renewed bonds as required, with additional security of Wm. Jernegan, which bonds were approved by the court."

The bill of Jernegan is voluminous, and presents some twelve grounds of release from liability as a surety of Gray, and to avoid the judgments against him and sureties. It was demurred to by the county of Coffee, and the grounds of demurrer go to all of its parts and points. It was also demurred to by several other defendants, sureties on the bonds of Gray for his first term. These demurrers were overruled by the court, but the parties were permitted to rely upon them in their answers. This was done, and in their answers all the allegations of the bill, presenting material points touching the liability of Jernegan, were clearly denied.

The first ground of relief presented in his bill is that Gray, at the time the power of attorney was

presented to him to sign, stated that one Carden and Garrison were going on his bonds, and promised not to use the power of attorney unless they signed it. If this were so, it is no ground of relief, in the absence of all knowledge of the condition on the part of the county, or facts affecting it or its represensatives with knowledge. Moreover, this conditional execution of the instrument is denied, and it is not sustained by the evidence.

The next ground of avoiding liability as surety, the judgments rendered in the circuit courtt, is rested on a construction of the power of attorney given to Ashley.

In the bill of Jernegan, and in the bill of Messick, Sr., East, Harrell and McGill, consolidated with it, and also in the cross-bill of Gray, it is insisted that Ashley exceeded or failed to pursue the authority conferred upon him, and that in consequence the sureties already on the bonds executed in September, 1878, being released by operation of the law extending the time for trustees to turn over the uncollected taxes to the constables, they were not bound by the action of Ashley. The contention on this point is that the power of attorney conferred upon Ashley authority simply to execute new bonds in their names, not to bind them under his bonds given at the beginning of his term. We are unable to assent to this proposition.

The language of the instrument is: "We, the undersigned, do hereby nominate and appoint Simeon Ashley our attorney in fact to *sign and acknowledge*

our names to *any* *bonds* that may be required of Edmond Gray, etc., by the said county court," etc. The manifest import of this language was to authorize Ashley to bind them to stand as sureties for Gray in the collection of the public revenue, under such obligations or bonds as the county court might require, and such must have been their intention, viewing the instrument in the light of the circumstances attending its execution, and the legal relations of Gray to the public trust he was proposing to discharge, under the sanction of the guaranty for his fidelity authorized to be given by it.

We have no hesitation in holding, under the facts of this case, independent of the provisions of our Code relative to the liability of sureties on the bonds defectively executed of public officers charged with the collection or custody of public funds, that these parties are bound for the defaults of Gray, committed by him during his last term, by virtue of the action of Ashley under the power of attorney executed by them. But if there were any doubt on this point it is removed by the provisions of the Code.

If correct in this holding, it disposes of the plea of *non est factum,* presented in the amended bill of Jernegan, for under the facts in the case, that plea was predicated on the theory that Ashley was not authorized to bind him under the terms and conditions of the bonds executed by Gray in September, 1878, at the beginning of his second term. It also disposes of the point raised, that he is not responsible for any collections of Gray made during his

second term, and before his name was signed to the
bond on the first Monday in March, 1879. It, more-
over, puts out of the case the contention that what
Ashley did in the premises, with the consent of the
county court, amounted to an alteration and spoliation
of the public records, and, therefore, operated in law
to release all the sureties on his bonds.

It is insisted that the bonds executed by Gray,
for county and school taxes, were not for double the
amounts of the aggregate tax lists for county and
school purposes, and that his sureties can in no event
be held for a greater sum than was actually intended
to be secured at the time the bonds were executed,
and as Gray had paid over that sum, the bonds, as
to them, were discharged.

There is no merit in this. They are responsible
to the extent of the penalties of their bonds, and
there is no pretense that Gray paid over amounts to
the county on the county tax proper, or to the county
on the school tax, equal to the penalties of his bonds
for these purposes. Equally groundless, under the
facts in the record, is the claim that tax assessments
on railroads, amounting to $5,100.70, for the years
1875, 1876, 1878 and 1879, which were not taken into
consideration when his bonds were executed, came
into the hands of Gray after his term of office had
expired and his successor had been elected and qual-
ified.

The fact is, these taxes legally came to his hands
during his term of office, and he collected them be-
fore its expiration, and should be made to account

35—VOL. 14.

for them; and the position that, because these taxes were not separately before the minds of the sureties when they executed his bonds, they are released from all liability for all defaults of their principal in respect to them, when their bonds in so many words bind them for his faithful and proper disposition of all public revenues that come into his hands, or that ought to come into his hands by virtue of his office, is sanctioned neither by the principles of law nor by the dictates of a sound public policy.

There is a general allegation in the bill of Jernegan of errors, discrepancies and overcharges in the settlements made with Gray by the county court, but none are pointed out, and the allegations of the bill on this point are totally insufficient to open the settlement. But the evidence in the record discloses none affecting the correctness of the judgments.

Another point earnestly pressed by counsel for Jernegan is that the judgments are void, because the notice served upon Gray was signed by the chairman of the county court, and the suit thereon was commenced in the name of the chairman against Gray and his sureties. The contention is that the suit, by motion, should have been in the name of the State for the use of the party entitled to receive the fund, against the parties, and not in the name of the chairman of the county court, and that the notice should have been in the name of the State for the use of the county, or the party entitled to receive the fund; and it is insisted, with much plausibility, that as Gray, and through him his sureties, were before the

court by virtue of the notice signed by the chairman, to answer his suit, based upon his notice, neither Gray, nor they, were legally before the court at all, in the suit of the State of Tennessee for the use of Coffee county, in which suit the judgments were rendered, and that, therefore, the court having no jurisdiction of their persons, the judgments are void.

It is conceded that the suit should have been in the name of the State for the use of the party entitled, and that the notice to Gray should have been given of an intended motion upon a day designated in the name of the State for the use of the party entitled. But if Gray appear in court in response to a notice of an intended motion instituting suit against him and sureties in alleged form, and the motion is, in effect, entered and continued in the name of an improper party as plaintiff, by his consent, and at the next term, by his consent or acquiescence, the cause is entered in the name of the State for the use of the county, against him and sureties, which is the proper and legal form in which to prosecute it, and thereafter it is prosecuted in the name of the proper party plaintiff, with his consent, another question is presented. It is certain that Gray cannot be heard to complain on this ground, because he was present in court consenting to all that was done, and his appearance and consent were equivalent as to him to a proper notice and motions entered in conformity to it. If correct in this, it follows that his sureties can not demand, as a condition precedent to the rendition of judgment against them, a

proper personal notice of the motion therefor to their
principal, when he enters his appearance and consents
to such judgment. If their principal act upon a
notice as sufficient, and consent to amendments in the
motion or motions entered thereon, which make them
conform to the law, they cannot be heard to com-
plain, either at law or in equity, in the absence of
fraud, collusion, or some other legal or equitable
ground of relief, arising out of the conduct, agree-
ment or transactions between their principal and the
parties proceeding against him and them; and for the
reason that a legal notice to him is, in contemplation
of law, notice to them, and as they are legally in
court when he is so, his appearance in court, and
consent to a judgment in the absence of fraud, or
collusion, or mistake, cognizable or correctible in law,
legally brings them before the court.

It is next insisted, that no motion could be pros-
ecuted against Gray and sureties for the school money
collected by him in 1879, and unaccounted for, in the
name of the State for the use of Coffee county, and
that the judgment rendered for the State for the use
of the county for school money is, in consequence,
absolutely void.

The contention is, that under the act of 1879 the
motion would lie only in the name of the State for
the use of the successor in office of Gray, and 9
Lea, 168, is cited in support of this position.

"The first of these cases," says Judge Freeman,
delivering the opinion of the court, 9 Lea, 168, "in-
volves the question whether the superintendent of pub-

lic schools of Carroll county, and trustee, and school directors of the various districts of said county, or any of these parties, in their official capacity, can maintain a bill in chancery against the sureties of a defaulting former trustee for an account of moneys collected by him in the county for the use of common schools, or as charged in the bill, money belonging to the public school fund of said county?" The chancellor in the case held that they could not, and it would seem, on the ground that the remedy of the party entitled to the fund was by motion. This action of the chancellor was reversed, and the court in its opinion, held, that under the statutory provisions of our law in reference to the school funds of the county, the county trustee, by virtue of his office, and as such, is the legally constituted custodian of them. It was also held, that under section 427, subsection 2, of the Code, it was the duty of the trustee going out of office to deliver to his successor all his official books, etc., and by the next section, to make settlements with the revenue commissioners, and pay over balance found in his hands to his successor.

The court in the case of *Bayless* v. *Driskill*, 5 Lea, 265, after citing the act of July 7, 1870, (T. & S. Rev. Code, sec. 962, *et seq.*) Rev. Code, sec. 992*a*, sub-sec. 4, sec. 1026*a*, and sec. 1028*a*, held that under these provisions of the common school law, the trustee was liable to a judgment by motion, at the instance of school commissioners of school districts, for his failure to pay over money in his hands coming to their districts, as required by law. And in the

case of The State for the use of Hawkins county v. Starnes, it was held that a collector of revenue and his sureties were not liable by motion on his general bond given for collection of county or State revenue, for collection of school fund, and for the reason that under the provisions of our law a separate bond is required to be given for its collection and proper disbursement: 5 Lea, 545.

There can be no question as to the correctness of these decisions. But they do not raise nor decide the point in question in this case.

The case in 5 Lea, last above cited, was brought by motion in the name of the State for the use of the county against the collector and his sureties, and no question was raised as to the suit having been properly brought, or that the collector and his sureties would not be liable in the suit, as brought, if he had given a bond to cover the proper collection and disbursement of the school tax. In this case it is conceded that Gray gave bond for the collection of the school taxes, and to properly account for them. And we think, under sec. 461 (M. & V. Code), and sec. 483, *et seq.*, defining duties of the judges or chairmen of county courts, and sections 489, *et seq.*, and other provisions of the laws in regard to the duties of trustees, this motion was maintainable in the name of the State for the use of Coffee county against the parties. If there were any doubt, under the provisions of the Code already cited, it is removed by sec. 798, (M. & V. Rev. Code), which, speaking of collectors of revenue, says: "For any neglect or refusal to

Jernegan *v.* Gray.

settle his accounts, the comptroller and judge or chairman of the county court shall proceed against the collector and his sureties, by motion, which shall not be abated, quashed or delayed by any want of form or informality in prosecuting the same."

There are many other questions raised in the pleaadings by the sureties and Gray, but they need not be noticed, as they are without legal merit.

The demurrers of the county to the bills and the cross-bill should have been sustained.

It is difficult to see, from the evidence in this record, what benefit the sureties on the bonds for the last term can get by remanding the cause to be proceeded in under the decree of the chancellor for an account between them. But as the chancellor permitted an appeal from his decree, simply dismissing the bills as to the county, and ordering a reference for an account upon the evidence already in the record, as well as such additional evidence as the parties might adduce, as a basis for contribution among the sureties, we will affirm his decree with cost, and remand the cause for further proceedings in accordance with it. The cost of the appeal will be taxed in accordance with the agreement of the parties shown in the record.